**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

Dec. 10, 1975.

way Labor Executives Ass'n and Brotherhood of Railway & Airlines Clerks.

Mulholland, Hickey & Lyman by Kenneth Crosson, Washington, D. C., for Railway Labor Executives Ass'n.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First Nat'l City Bank of N. Y.

Willkie, Farr & Gallagher by Walter H. Brown, New York City, for Institutional Investors Penn Central Group.

Ballard, Spahr, Andrews & Ingersoll by Richardson Blair, Lewis A. Grafman, Philadelphia, Pa., for Girard Trust Bank, Indenture Trustee Institutional Investors and Schedule A Indenture Trustees.

Meyer, Lasch, Hankin & Poul by Herman B. Poul, Philadelphia, Pa., for District No. 22, Int'l Ass'n. of Machinists, Conrail System Bd. of Adjustment, Pa. Federation Brotherhood of Maintenance of Way Employees.

James F. Dausch, Dept. of Justice, and Jerome Sharfman, Washington, D. C., Dept. of Trans., for U. S.

Pepper, Hamilton & Scheetz by John G. Harkins, Jr., Philadelphia, Pa., for Conrail.

Drinker, Biddle & Reath by Henry W. Sawyer, III, Lewis H. Van Dusen, Jr., Philadelphia, Pa., for SEPTA.

Gordon P. MacDougall, Washington, D. C., for Commonwealth of Pa.

David Berger, P. A., by David Berger, Daniel Berger, Philadelphia, Pa., for Penn Central Co.

James E. Howard, Paul Duke, Carl Helmetag, Philadelphia, Pa., for Trustees, PCTC.

Sullivan & Worcester by Joseph Auerbach, Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford RR Co.

Highsaw & Mahoney by William G. Mahoney, Washington, D. C., for Rail-

## MEMORANDUM AND ORDER NO. 2123

FULLAM, District Judge.

The Government has filed a "Petition . . . for an Order to Preserve Debtor's Rail Properties" (Document No. 9643), and the Trustees of the Debtor have filed a "Petition . . . for Instructions Concerning Payment of Retroactive Wage Adjustments and Certain Special Accounts" (Document No. 9645). These petitions, which were heard together on December 5, 1975, raise closely-

related, and unusually difficult, problems concerning the proper administration of the Debtor's estate during this interim period before final conveyance of substantial portions of the Debtor's railroad to Conrail pursuant to the Regional Rail Reorganization Act of 1973 ("RRRA").

The record brings into focus several areas of sharp conflict between the Government representatives on the one hand, and representatives of the Trustees, the creditors, the stockholders, indeed all other parties to the reorganization proceeding, on the other. The task of this Court in attempting to resolve these conflicts has not been made easier by the increasing polarization of views reflected in the arguments of counsel for the respective sides. Counsel for the estate interests tend to accuse the Federal Rail Administrator (acting herein for the Secretary of Transportation) of attempting to frustrate the intent of Congress by withholding funds expressly appropriated by Congress to meet the railroad's current operating deficits, thus intentionally aggravating the unconstitutional erosion of property rights, jeopardizing a rational transition to Conrail, and unnecessarily magnifying eventual claims against the Government under the Tucker Act. Counsel for the Government, on the other hand, accuse the Trustees and the creditors of trying to use RRRA funds for other purposes than current operating deficits; of attempting to upset the careful plans of the FRA for prudent administration of the entire RRRA funding program; and even of seeking to create fictional crises for the purpose of jeopardizing continued rail service. While not all of these mutual suspicions are entirely groundless, many of them are. The persuasiveness of a given argument is not enhanced by overstatement, or by shrillness in delivery.

■ I start with the proposition that Congress has supplied a certain amount of money for the purpose of enabling the bankrupt railroads to continue to provide rail service until the date of conveyance (February 28, 1976) without running out of cash. The Federal Rail Administrator, acting for the Secretary of Transportation, is charged with the responsibility for administering that funding program. If the total funding proves insufficent, the railroads must nevertheless continue to operate, and the resulting further erosion will be compensable under the Tucker Act. I remain convinced, however, that Congress did not intend to vest the FRA with discretion to increase unnecessarily the liability of the Government under the Tucker Act by impounding RRRA funds, or by requiring the Trustees to defer until after the conveyance date the payment of current operating expenses not heretofore deferred which could be met through use of RRRA funding.

■ It is, of course, axiomatic that Congress did not intend the use of § 213 funds to prepay expenses properly attributable to post-conveyance operations or activities of the bankrupt railroads.

■ Thus, in my view, the bankrupt estates have no right to insist that all RRRA funds be exhausted during the pre-conveyance period, unless that is necessary to prevent further erosion which would otherwise be unconstitutional; and the FRA has no right to insist upon arriving at the conveyance date with a surplus of unexpended § 213 funds achieved through further unconstitutional erosion.

In attempting to insure that the affairs of the Debtor are managed in conformity with the foregoing general guidelines, certain *caveats* should be noted. In the first place, it is not always easy to identify a particular liability as properly attributable to pre-conveyance operations, rather than post-conveyance activities. Secondly, no one has suggested that the jurisdiction of this Court extends to directing the expenditure of public funds; a legal determination by this Court that certain unmet obligations of the Debtor's estate can properly be satisfied through the use of § 213 funds, for example, does not necessarily result in payment from that

source. And finally, the problems discussed below must be dealt with in the context of the present statute and existing uncertainties concerning its implementation, without regard to the considerable amount of Congressional activity now under way in this field.

## I. SPECIFIC PROBLEMS

A. *Retroactive Wage Payments.* The current impasse has been triggered by the necessity of satisfying the estate's obligation to pay certain systemwide wage increases, retroactive to January 1, 1975. With the approval and encouragement of the FRA, the Trustees have been paying the increased wages on a current basis since June, and have agreed to liquidate their obligation for the retroactive increases covering the January-June 1975 period before the end of the current calender year. Before agreeing to make these payments, the Trustees were assured by the FRA that § 213 funds would be made available, when appropriated, to the extent necessary to meet these retroactive wage adjustment obligations. The Secretary of Transportation sought, and obtained, an appropriation of some $60 million of § 213 funds upon a representation to Congress that the appropriation was primarily intended for use in making these payments. This Court earlier approved the Trustees' proposal to comply with the requirements of the new industry-wide labor contracts in reliance upon assurance that the FRA desired these payments to be made, and that § 213 funds would be made available as necessary in order to comply.

Obviously, if the Trustees had refused to carry out the terms of the agreements negotiated on an industry-wide basis, the likelihood of cessation of rail service because of strikes would have been very great. Hence, it is not surprising that all parties still agree that these payments must be made. The only issue is the FRA's right to insist that certain other funds of the Debtor be exhausted before § 213 funds will be made available.

■ The aggregate amount of January-June liability for increased wages is approximately $44 million, of which the Trustees have thus far paid approximately $10 million. The Trustees propose to liquidate the balance before Christmas 1975. With the consent of all parties, this proposal will be approved.

B. *Special Accounts.* The Government asserts that the Trustees should first be required to exhaust the funds in certain special accounts, before resorting to § 213 money. Initially there were three such accounts in question, but one of them, a reserve of approximately $9 million to cover the cost of settling certain judgments ("refrigerator car settlements") has been used by the Trustees to pay the first installment of the retroactive wage claims here involved, and the Government has agreed that § 213 funds will be made available to comply with the requirements of these agreed settlements. The two special accounts now in dispute are:

1. *Equipment Obligation Escrow.* Order No. 1981 requires the Trustees to repurchase from USRA certain obligations for installments on equipment (*see* Memoranda and Orders Nos. 1884, 1981, and 2100) not later than December 31, 1975. From time to time, the Trustees have tendered payment of these sums, but tender has been rejected. The underlying legal disputes are on appeal. The Trustees have escrowed approximately $13.4 million in order to comply with the foregoing orders of this Court. If these repurchases were carried out, the amount of available § 215 funds would be increased by that amount.

The current installments on equipment obligations are undoubtedly operating expense. In essence, it is the position of the Government that these payments should be made through the use of § 215 funds, with some potential residual liability for reimbursement postconveyance by the estate, rather than through the use of § 213 funds.

2. *Reserve for Unfunded Pensions.* Subject to certain limitations imposed by this Court, the Trustees have been carrying out most of the pre-reorganization pension programs of the Debtor (*see* Order No. 278 and Memorandum and Order No. 1087). The details of these programs have been discussed elsewhere in these proceedings and need not be repeated here. The salient points are summarized in the affidavit of Mr. C. A. Stiteler and in his testimony at the hearing.

In general, it may be said that a substantial portion of the Supplemental Pension Plan is unfunded, as are the Interim Pension Policy, the General Pension Policy, Supplement "A" to the Contingent Compensation Plan, the Relief Fund of the Voluntary Relief Department, a group life insurance program, and various individual and group contractual programs. It is estimated that the total liability of the Debtor's estate for the unfunded portion of these programs is in excess of $50 million.

To date, no firm decisions have been made by Conrail with respect to the number and identity of the Debtor's employees who will be offered continued employment by Conrail, nor as to the nature of the pension program which Conrail will adopt for its employees, nor as to the impact of the conveyance upon the Debtor's programs.

The situation is further complicated by the assured, but now incalculable, impact of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, pursuant to which the Trustees will be required, commencing January 1, 1976, to fund most of these various employee benefit programs.

The Government takes the position that the Trustees should continue to pay current benefits as heretofore, but that, since the Trustees have not previously made any provision for funding the programs with respect to either the future benefits payable to present retirees, or the rights of current employees who have not yet retired, they should not do so now, at least through the use of operating revenues which might have to be replaced by § 213 grants.

In mid-1975, the Trustees received an actuarial report analyzing the existing programs, from which it has been possible to arrive at a rough estimate of the scope of the problem, by calculating what impact ERISA would have had with respect to some of the major programs, if the Trustees had been obliged to comply with its funding requirements during 1975. Thereupon, faced with the certainty that some funding would be required commencing in January of 1976 (although arguably not irretrievably payable until mid-1976, or early 1977), the Trustees, in September 1975, as cash became available, began setting aside a reserve fund against this liability. At the present time, this special account contains approximately $20 million.

C. *Immediate Post-Conveyance Problems.* The Final System Plan as now formulated contemplates that, as of the conveyance date, all current assets will become the property of Conrail. All current liabilities for the pre-conveyance period will remain the obligation of the Debtor's estate, but Conrail, as agent for the Trustees, will collect the accounts receivable and use those funds to liquidate the pre-conveyance accounts payable. However, Conrail has advised the Trustees that it does not intend to pay cash for any of the current assets, and that it will pay pre-conveyance current liabilities only to the extent that cash becomes available from the accounts receivable. The net result is that the Trustees face an immediate post-conveyance working capital deficit ranging from at least $40 million to perhaps as much as $160–$200 million.

This looming problem is not now before this Court, but its existence may properly be noted as casting some light on the issue of the reasonableness of the positions taken by the parties in connection with the problems which are now before the Court.

## II. DISCUSSION

If the only criterion were the best interests of the Debtor's estate, a simplistic approach would be possible. It would obviously be in the best interests of the Debtor's estate for the Trustees to halt all further erosion, pay all administration and operating expenses on a current basis, and obtain as much § 213 money as possible. Representatives of the Government in these proceedings, perhaps not unnaturally, tend to view all of the Trustees' proposals as steps in the direction of that goal.

Conversely, if the sole criterion were the least possible immediate cost to the taxpayers, then all RRRA funding should be withheld, and the Trustees should be forced to invade secured interests in order to finance continued operations, and to defer all possible payments until after the conveyance.

But to adopt either of these extremes would be to ignore the scheme of the statute, and to obliterate the crucial distinction between sanctioning knowing and intential violations of constitutional rights, on the one hand, and, on the other hand, effectuating a legitimate legislative program notwithstanding the fact that it may prove to have unintended unconstitutional consequences which can be rectified through a Tucker Act remedy.

The RRRA is a complex statute, and its implementation has involved some unforeseen difficulties. I am persuaded that much of the mutual skepticism displayed by the parties in the present proceeding is attributable to the methods chosen by each side for dealing with the many existing uncertainties and contingencies. The Trustees wish to guard against the possibility that they will be faced, after the conveyance date, with large amounts of unpaid liabilities for pre-conveyance operations which should have been met with § 213 funds; that they will no longer be eligible to receive § 213 money, even though there may then be a surplus of unexpended § 213 funds; and that their problems will be rendered utterly insurmountable by the working cash deficit problem alluded to earlier. The FRA, on the other hand, understandably wishes to reserve a reasonable amount of § 213 money to meet possible unforeseen emergencies, hence wishes to use § 215 funds wherever possible, so as not to "lose" the opportunity to do so, and wishes to require the Trustees to postpone as many problems as possible until after conveyance.

Ordinarily, the solution to an impasse of this kind would seem to be relatively simple: meet the cash needs as they arise, keep careful and accurate accounts, and sort out the issues surrounding the correct application of various funds after the conveyance date, in light of what actually did happen, rather than pursue the present course of trying to deal finally with each issue in isolation, on the basis of predictions which are at best educated guesses, and which in many instances are pure speculation. I have not been made aware of any compelling reason for rejecting this "wait and see" approach in the present case.

The pension funding issue provides a clear example. The Trustees undoubtedly have a substantial legal liability (statutory, contractual, or both) which is attributable to current operations during the pre-conveyance period. At the present time, it is impossible to calculate the precise amount of that liability. It will be greater or lesser depending, to a large extent, upon decisions yet to be made in connection with the establishment of Conrail. In like vein, there are uncertainties pertaining to the demands for RRRA funds which may properly be made by Penn Central and the other bankrupt railroads.

Thus, at one extreme, it is conceivable that the Trustees' actual pension-funding liability properly attributable to the pre-conveyance period will be $20 million, as they project; and that there will be ample § 213 funding to cover that as well as other operating deficits. At the other extreme, it is possible ei-

ther that the Trustees will have no such liability (*e. g.*, if all programs can be terminated, and values are then such as to provide full coverage; or if Conrail absorbs most of the Debtor's employees and provides a compatible pension program), or that the available RRRA funding will have been exhausted due to unforeseen emergencies or other intervening events, so that these and other operating expenses will necessarily be deferred, and eventual compensation under the Tucker Act thereby increased. In the nature of things, it is probable that actual events will produce a result lying somewhere between these two extremes. Surely, the legal system should be able to devise a mechanism with sufficient flexibility to produce an accommodation which will represent just treatment in light of actual events.

In my view, neither the Trustees nor the FRA should be permitted to structure the interim operations of the railroad on a "heads I win, tails you lose" basis. If the Trustees' present proposals were adopted, and if their present cash forecast proves reasonably accurate, they would be able to finance operations until the conveyance date without resort to additional § 213 funds except for the purpose of paying the retroactive wage adjustment, and would have $20 million in cash available to meet their pension funding responsibilities. But if the $20 million proved to be more than was needed for that purpose, the Trustees would presumably be free to use it for other purposes (which would thus have been indirectly paid for by the § 213 funds used to make the retroactive wage adjustments). While this would probably merely balance other inequities which implementation of the RRRA would involve, the fact remains that, under the present statute, § 213 funds may not be used for such purposes.

On the other hand, acceptance of the Government's position would improperly require the Trustees to defer one aspect of labor costs for the purpose of paying the retroactive wage increases, even though Congress expressly provided § 213 funds for that purpose.

■ It is no answer, in my view, to assert that the unfairness inherent in the Government's proposal can be disregarded because it is susceptible to remedy in the Special Court and in a Tucker Act suit in the Court of Claims. Pre-conveyance operating deficits are to be paid in cash, to the extent that Congress has provided the cash, and not in Conrail securities or a Tucker Act judgment, unless as a last resort.

As suggested earlier, it would seem preferable for the FRA and the Trustees to enter into a comprehensive financing agreement pursuant to which § 213 funds and the special accounts here in question could be jointly used as needed to defray operating expenses, subject to a final accounting and appropriate adjustments as between sources of funds, as of the conveyance date. I have not been made aware of any insuperable legal impediment to some such quasi-escrow arrangement. But in the absence of any such comprehensive agreement, it is necessary to deal with the specific issues as best we can.

In the case of the equipment obligation repurchase account, the suggested solution has been achieved, in effect, by the Government's concession that further tender of repurchase will not be necessary, and that this Court may appropriately adjust the legal consequences to the parties in light of final appellate disposition of the underlying legal issues.

■ This leaves for consideration the pension funding special account. On the present record, I have concluded that it is essential to the proper performance of the Trustees' responsibilities for prudent management of the affairs of the Debtor to make some provision, on a current basis, for that portion of their pension responsibilities attributable to the pre-conveyance period.

And, while the Trustees' estimate of $20 million may be valid, it seems probable that, as a practical matter, the actual liability for the pre-conveyance period can be reduced substantially below that amount. The circumstances do not permit a high degree of confidence in the correctness of a judgment in this area, but I am inclined to believe that a more realistic figure would be $10 million. I will therefore direct the Trustees to continue to hold in a special account the sum of $10 million as a reserve against such liabilities. The Trustees will not, however, be permitted actually to use these funds for that purpose or any other purpose, except upon further order of this Court. The net result will be that these funds can still be made available, if necessary, to support continued rail operations pre-conveyance if RRRA funding has been exhausted, and that any balance remaining after providing for the actual pension liability can be restored to the appropriate agency.

An order will be entered in conformity with the views expressed above.

### ORDER NO. 2123

And now, this 10th day of December, 1975, upon consideration of the "Petition of Trustees for Instructions Concerning Payment of Retroactive Wage Adjustment and Certain Special Accounts" (Document No. 9645), and the "Petition of the United States of America for an Order to Preserve Debtor's Rail Properties" (Document No. 9643), and after hearing thereon of which due notice was given, it is hereby ORDERED that:

1. The Trustees are authorized and directed to hold in an existing Special Account the sum of $10 million as a reserve against unfunded pension liabilities. The funds held in said Special Account shall not, without further order of this Court, be used or considered to be available for other expenses of the Debtor's estate.

2. The Trustees are authorized and directed, using operating revenues of the estate other than the funds referred to in Paragraph 1 above, together with any grant funds which may be provided under § 213 of the Regional Rail Reorganization Act, to pay the balance of the amount due to employees in connection with the retroactive portion of the wage increase the Trustees were authorized to pay in Order No. 1827.

3. The Trustees are directed to seek approval from the appropriate officials and agencies of comprehensive arrangements for financing interim operations, in accordance with the views expressed in the accompanying Opinion, and to report to this Court within fifteen (15) days the results of such efforts.